## PHILLIPS PETROLEUM CO. v. TOWNSEND et al.

### No. 6659.

Circuit Court of Appeals, Fifth Circuit. Feb. 10, 1933.

Rehearing Denied March 8, 1933.

294

the Fourteenth Amendment of the Constitution of the United States. The discrimination claimed was that the complainant's property in Willbarger county, Tex., had been assessed at full value, while that of banks in the county was intentionally assessed at only 70 per cent., and that in valuing the complainant's oil reserves the arbitrary and unreasonable method used was to multiply the average daily production of each lease for the last quarter of the preceding year by $200 per barrel, without taking into account many things that might affect the quantity of oil in reserve and its value. From an adverse decision Phillips Petroleum Company appeals.

The Constitution of Texas, art. 8, § 1, requires equal, uniform taxation of property in proportion to its value. Rev. Stats. of 1925, art. 7174, directs realty to be valued at its true full value in money, forbidding a lower value because fixed for purposes of taxation, or that value for which the property would sell at forced sale, or an average for the county. Leasehold estates are to be valued at such price as they would bring at a fair voluntary sale for cash. The value meant in the Constitution and the statutes is the reasonable cash market value. Rowland v. City of Tyler (Tex. Com. App.) 5 S.W. (2d) 756, 757. "Determined by what it [the property] can be bought and sold for." Lively v. M., K. & T. R. Co., 102 Tex., at page 558, 120 S. W. 852, 856; New York State v. Barker, 179 U. S. 285, 21 S. Ct. 121, 45 L. Ed. 190. Discrimination, intentional, systematic, and persistent, in valuation entitles the taxpayer to relief in state or federal courts, although his own property may not have been assessed above its full, fair value. Lively v. M., K. & T. R. Co., supra; Greene v. Louisville R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979. A refusal to recognize obvious differences in value due to location, accessibility, and the like shows such discrimination. Cumberland Coal Co. v. Board of Revision, 284 U. S. 23, 52 S. Ct. 48, 76 L. Ed. 146. On the other hand, when honest judgment is used in the exercise of lawful jurisdiction, and no fundamentally wrong principle is applied, mere difference of opinion as to value on the part of a court does not warrant its collateral interference. Druesdow v. Baker (Tex. Com. App.) 229 S. W. 493; Louisville & Nashville R. Co. v. Greene, 244 U. S. at page 536, 37 S. Ct. 683,

Don Emery and R. K. Batten, both of Amarillo, Tex., and Wm. N. Bonner, of Wichita Falls, Tex., for appellant.

T. R. Boone, of Wichita Falls, Tex., and O. T. Warlick, of Vernon, Tex., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Because of cloud on title and inadequate remedy at law, Phillips Petroleum Company sought to enjoin the collection of taxes under an assessment which was claimed to be discriminatory in contravention of article 8, § 1, of the Constitution of Texas, and

61 L. Ed. 1291, Ann. Cas. 1917E, 97; Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979. These principles were recognized and applied by the District Court.

The real complaint here is of the court's findings of fact that there was no intentional refusal to consider all proper elements in valuing appellant's property, and no systematic and intentional undervaluation of the property of other taxpayers. While some portions of the testimony give color to appellant's contentions, the evidence as a whole supports the conclusion of the court. The board of equalizers gave appellant a full hearing, and excluded none of its evidence from consideration. The county officials had employed a practical oil man of 31 years' experience to inspect and appraise all of the oil properties in the county, including those of appellant. He valued separately machinery and equipment used on the several leases, and, in order to value the oil reserves in the ground, ascertained the average daily production in barrels from each lease for three months prior to January 1, 1931, the date as of which valuation was to be made, and multiplied such production in barrels by a factor of $200, which he testified he considered a fair average for that date. He did not explain the basis on which $200 per barrel was arrived at, but did say that two years previously the figures should have been $500 or more, as oil was then selling for twice as much, and the wells had a longer production life. Evidently the use of such a factor is familiar to oil men, and includes an estimate of probable future production for the life of the well, the probable price of oil, the cost of producing it, and other matters that an oil man would consider in buying or selling a lease. We find one of the appellant's witnesses, More, experienced for 23 years in buying and selling such property, referring familiarly to a factor of $250 per barrel as his idea of the maximum value of the leases in question as of January 1, 1931. He apparently includes value of equipment while it was excluded by the county's appraiser in using the figure $200. We do not doubt the worth of the more complicated and refined calculations of the appellant's expert witnesses who emphasized separate additional consideration of geological formations pierced, the curve of production shown in charting the whole history of each well, allowance for risk of error, discount for deferred receipts, margin of profit, and other things. These are proper to be weighed by those competent to do so, but we are not convinced that they have been wholly excluded from the basis of $200 adopted by the appraiser, for he states that such things are in his opinion proper to be considered. But his appraisement does seem to be subject to the criticism that it was an average for the county, contrary to the prohibition of the statute. This error was not, however, followed by the board of equalizers, for they testified that they considered each lease separately in the light of their general knowledge and of the evidence produced to them and corrected the appraisement accordingly. It appears that the appraiser's values were greatly reduced by them, sometimes as much as 20 or 25 per cent. The result was in round figures a total value for the leases of $450,000. That reached by one of appellant's experts was $359,000, and by the other $351,000, although the former excluded nine wells as practically exhausted, and the latter testified that one only in his opinion was approaching exhaustion. The market for oil on January 1, 1931, was around $1 per barrel, and the average for previous years was $1.25 or more. Appellant's experts used a price of 70 cents; oil having in fact descended to lower values during 1931. It may be that their use of a lower price basis explains the difference in resulting estimates. Which price basis would be right as the probable average over the future life of the well is but a question of judgment. It is significant that the board at the same hearing fixed the value of the leases of the Cosden Oil Company and the Texas Company on the same basis, and the representative of the former, testifying for appellant, said that he accepted the basis. We think there was an honest effort to value property difficult of valuation, with no arbitrary exclusion of pertinent considerations. We are not even convinced that a substantially erroneous value was reached.

The contention of systematic undervaluation of the property of other taxpayers is not sustained by the evidence. It has already been stated that other oil properties were valued at the same time and on the same basis as those of appellant. The only discriminatory undervaluation claimed is that the capital and surplus of banks were valued for taxation at 70 per cent. of their true value. Some of the answers of the equalizers to leading questions so indicate, but their testimony as a whole, supported by comparisons of the several banks' statements as of January 1, 1931, with the assessed values, shows

that what they did was to take the book value of the banks' assets and discount it 30 per cent. because the board did not regard them as worth their face value. The frozen, faulty condition of bank assets was notorious at the time, and in fact two of the seven assessed banks were closed by the bank examiner during the year 1931 and a third during the next year. No intentional underassessment appears.

Judgment affirmed.